UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RICHARD B. MOORE,

                                    Plaintiff,


        v.                                          3:05-cv-0175

JOSEPH A. ANDRENO, at. al.,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

## I.      INTRODUCTION

        Plaintiff Richard Moore commenced the instant action asserting claims pursuant to

42 U.S.C. § 1983 and under state law arising out the search of his residence and his

subsequent prosecution.  Presently before the Court are Defendants' motions for summary

judgment filed pursuant to Fed. R. Civ. P. 56 seeking dismissal of various causes of action.[1]

## II.     BACKGROUND

        The following facts are taken from Defendants' Statement of Material Facts

submitted pursuant to N.D.N.Y.L.R. 7.1.  Because Plaintiff failed to timely submit a counter

---

[1] Defendants' motions do not address Plaintiff's claims asserted in his Second and Third causes
of action or any claims asserted under the Fourteenth Amendment.  While it appears that these causes of
action are without merit, the Court declines to rule on them without an appropriate motion by Defendants.
Accordingly, those claims survive Defendants' motions.  Further, as noted in the Court's July 11, 2006
Order (Dkt No. 36), Plaintiff failed to timely file opposition papers to Defendants' motions.

statement of material facts as required by Rule 7.1, the facts set forth in Defendants'

statement of material facts is deemed admitted.  N.D.N.Y.L.R. 7.1(a)(3).

Defendant Ruth Sines was a resident of Plaintiff's home for approximately 1.5

years commencding in 1996.  She was again a resident of his home for approximately six

months during the period of the fall of 2001 until April 2002.  Sines had a key to the home.

On April 9, 2002, Plaintiff and Sines were driving from Tennessee to New York.  During that

trip, the two got into an altercation during which Plaintiff choked her against the seat and

stated that he would kill her and that "they would find pieces of [her] body in the ditches

between Tennessee and New York."

On April 11, 2002, Sines packed up her belongings with the intention of moving out

of the home.  At some point in time during the packing, Sines could not locate certain

personal property.  She believed that Plaintiff locked these missing items in his study.  Sines

obtained bolt cutters from the basement and cut the locks leading to Plaintiff's study.

Sometime thereafter, Sines's cell phone began to ring.  Sines proceeded to the front porch

for better reception.  When she answered the phone, the caller hung up.  Sines thought it

might have been her son calling.  Sines called her son who denied placing the call.  Plaintiff

then thought it might have been Plaintiff.  According to Sines, Plaintiff knew that she would

not answer her cell phone while at work.  Sines, therefore, believed that Plaintiff had

discerned that she was at the home (and not at work) and moving out.  Believing that her life

may be in danger, Sines called the Delaware County Sheriff's Department.

Shortly thereafter, Defendants Delaware County Deputy Sheriffs Joseph Andreno

and Kurt Palmer (collectively the "Deputies") arrived at Plaintiff's residence.  Upon their

arrival, Sines informed Andreno and Palmer that nobody was allowed in the house and that

Plaintiff would kill them.  The Deputies assured Sines that Plaintiff would not kill her.  Plaintiff then invited the Deputies into the house.  Later, Plaintiff led the Deputies into the study.  Once in the study, Plaintiff began looking for her personal items.  While conducting her search, Plaintiff opened up a desk and found marijuana inside.  As Sines looked through the closet, she found prescription drugs.  Sines provided the drugs to the Deputies.  Neither of the Deputies opened any containers or packages in the room.  Palmer bagged and logged the drugs found in the room.

On May 8, 2003, Plaintiff was indicted by a grand jury on two counts of criminal possession of a controlled substance in the fourth degree and one count of criminal possession of a controlled substance in the fifth degree.  On or about June 4, 2003, Plaintiff was arrested and booked into the Jefferson County, Tennessee Jail by the Jefferson County Sheriff's Office.  On June 6, 2003, Andreno and another law enforcement officer transported Plaintiff from Tennessee to New York.  Plaintiff was then booked on the above-mentioned charges.  The County Court, Delaware County suppressed all the evidence seized from Plaintiff's study.  On February 9, 2004, the County Court dismissed the Indictment against Plaintiff.

Plaintiff then filed the instant action asserting claims pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 arising out of the search of his home, his arrest and his prosecution.  Plaintiff also asserts various state law causes of action.  Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the claims of an unlawful search, malicious prosecution, the intentional infliction of emotional distress, and the claims asserted against Defendants Mills, Sines, and the County

of Delaware.  Plaintiff failed to timely submit opposition papers.  See Dkt. No. 46 (Order

denying motion for an extension of time).

**III.     DISCUSSION**

      **a.     Standard of Review**

      It is well settled that on a motion for summary judgment, the Court must construe

the evidence in the light most favorable to the non-moving party, see Tenenbaum v.

Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where

"there is no genuine issue as to any material fact and . . . the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if the relevant

evidence is such that a reasonable jury could return a verdict for the non-moving party.

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment

bears the burden of informing the Court of the basis for the motion and of identifying those

portions of the record that the moving party believes demonstrate the absence of a genuine

issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).

      If the movant is able to establish a basis for summary judgment, the burden of

production shifts to the party opposing summary judgment who must produce evidence

establishing the existence of a factual dispute that a reasonable jury could resolve in his

favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  On a

motion for summary judgment, the Court views the evidence in the light most favorable to the

non-moving party, and draws all reasonable inferences in his favor.  Abramson v. Pataki, 278

F.3d 93, 101 (2d Cir. 2002).  However, a party opposing a properly supported motion for

summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings,

Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998).

> **b.**     **Fourth Amendment**
>
> > **1.**     **Consent**

Plaintiff claims that Defendants unlawfully entered his home and study and unlawfully seized certain items from his study.  Defendants Andreno and Palmer move to dismiss on the ground of qualified immunity.  Defendants claim that their actions were not unlawful and that it was objectively reasonable for them to conclude that their actions were lawful because they entered the home upon Sines's invitation, they reasonably believed that Sines had the authority to invite them into the home, and, upon entering the home, they found the controlled substances in plain view.

"Qualified immunity protects government officials from civil liability when performing discretionary duties 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Demoret v. Zegarelli, --- F.3d ----, ----, 2006 WL 1554229, at *5 (2d Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).  "In deciding whether qualified immunity applies, the threshold inquiry is whether the plaintiff's version of the facts 'show[s] the officer's conduct violated a constitutional right.'" Demoret, 2006 WL 1554229, at *5 (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001)).  If such a violation can be demonstrated, "government officials will be immune from liability if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time." Demoret, 2006 WL 1554229, at *5.

A warrantless search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One such exception is that a warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent.  See Georgia v. Randolph, 126 S. Ct. 1515, 1520 (2006); Schneckloth, 412 U.S. at 222.  "That person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent. . . ." Georgia, 126 S. Ct. at 1520 (internal citation omitted).  "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." Id.  "The question with respect to a third-party authorization is whether the third party possessed 'a sufficient relationship to the searched premises to validate the search.'" United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995) (quoting United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988), cert. denied, 493 U.S. 839 (1989)).  A third party may validly grant the requisite consent if she has joint access or control of the property for most purposes. Elliott, 50 F.3d at 186; see United States v. Matlock, 415 U.S. 164, 171 n.7 (1974); Trzaska, 859 F.2d at 1120 (finding that estranged wife could properly consent to search of defendant's apartment).  As the Supreme Court has explained:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Matlock, 415 U.S. at 171, n.7.  "Thus, in any third party consent case, the issue to be resolved is whether the consenting party possessed a sufficient relationship to the searched premises to validate the search.  Mutual use of property, or joint access or control of property, is generally sufficient."  Trzaska, 859 F.2d at 1120; see United States v. Bradley, 869 F.2d 417, 419 (8th Cir. 1989)(Common authority is a function of mutual use, joint access, and control); Ramirez, 115 F. Supp.2d at 407.  "Mutual use of property by virtue of joint access is a fact-intensive inquiry requiring findings that the third party 'entered the premises or room at will, without the consent of the subject of the search.'"  U.S. v. Corley, 342 F. Supp.2d 776, 779 (N.D. Ind. 2004) (quoting United States v. Rith, 164 F.3d 1323, 1328 (10th Cir. 1999)).  Whether a person has "control for most purposes" is "a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  Rith, 164 F.3d at 1328.  "If a relationship creates such a presumption of control and is unrebutted, the third party has authority to consent to a search of the property."  Id. Relationships such as husband and wife or between paramours creates such a rebuttable presumption of control.  Id.; see also United States v. Duran, 957 F.2d 499, 504-05 (7th Cir. 1992).

Here, the undisputed evidence demonstrates that Andreno and Palmer reasonably believed that Sines was a legal occupant of the residence and had authority to consent to entry.  Indeed, Sines and Plaintiff were paramours, Sines had a key to the premises, and her furniture and possessions were inside.  See Georgia, 126 S. Ct. at 1521-22.  Sines also informed the police that she paid some of the bills at the home.  These facts suggest that Plaintiff did have authority, actual or apparent, to consent to the officers' entry into the home.

Plaintiff has offered insufficient evidence rebutting the facts and presumption indicating that Sines had authority to consent to the Deputies' entry into the home.  Thus, the entry into the home itself was not a violation of Plaintiff's constitutional rights.  Even if Sines did not have actual or apparent authority, Andreno and Palmer's conduct was objectively reasonable and, therefore, they are entitled to qualified immunity.

The next question is whether Andreno and Palmer's entrance into the study within Plaintiff's home constituted a constitutional violation and, if so, is protected by qualified immunity.  As the Supreme Court has acknowledged, "[i]t is . . . easy to imagine different facts on which, if known, no common authority could sensibly be suspected."  Georgia, 126 S. Ct. at 1522.  Thus, for example, "when it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent; 'a child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman, might well be admitted,' 4 LaFave § 8.4(c), at 207 (4th ed. 2004), but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom."  Id.  "If a specific area is in fact surrounded by an independent privacy interest, a government agent must either obtain a warrant to search it or is required to bring his examination within one of the exceptions to the warrant requirement."  United States v. Buettner-Janusch, 646 F.2d 759, 766 (2d Cir. 1981); U.S. v. Orejuela-Guevara, 659 F. Supp. 882, 888 (E.D.N.Y. May 08, 1987).  "Since third party consent does not involve the vicarious waiver of a defendant's constitutional rights, it validates a search only when a defendant can be said to have assumed the risk that someone having authority over the area to be searched would permit the governmental

intrusion in his own right." Buettner-Janusch, 646 F.2d at 764.  Whether a specific area is surrounded by an independent privacy interest is not always readily ascertainable.  In Frazier v. Cupp, 394 U.S. 731 (1969), for example, a criminal defendant sought to suppress certain evidence seized from a duffle bag.  The evidence in that case was that the defendant jointly shared the duffle bag with his cousin and the cousin consented to a search of the duffle bag. The defendant argued that the cousin only had permission to use one compartment within the duffle bag and, therefore, had no authority to consent to a search of the other compartments.  The Supreme Court quickly dismissed this argument stating that "[w]e will not, however, engage in such metaphysical subtleties in judging the efficacy of [the cousin's] consent.  [The defendant], in allowing [his cousin] to use the bag and in leaving it in his [cousin's] house, must be taken to have assumed the risk that [his cousin] would allow someone else to look inside."  Id. at 740.  "The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules."  Georgia, 126 S. Ct. at 1522.

It would seem that where, as here, co-occupants are residing together not as mere roommates, but as part of an intimate relationship, social expectations are that the co-occupants of the home enjoy full access to the entire home.  Dell v. State, 2004 WL 1783629, at *4 (Alaska App. 2004) ("When a man and a woman are living together under circumstances which approximate that of husband and wife, albeit without the benefit of marriage, there would appear to exist a degree of intimacy which would support a finding of rather broad consent authority in each of them."); United States v. Duran, 957 F.2d at 504-05 (similar).  Indeed, in Georgia, the Supreme Court noted that:

> Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior, a fact reflected in a standard formulation of domestic property law, that "**[e]ach cotenant ... has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other cotenants.**" 7 R. Powell, Powell on Real Property § 50.03[1], p. 50-14 (M. Wolf gen. ed.2005).

126 S. Ct. at 1523 (emphasis added).  Thus, as a general rule, a man and woman living together in a residence as part of an intimate relationship have the right to use and enjoy the entire property.  As previously discussed, paramours have presumptive authority to consent to all areas of the homestead.  <u>Duran</u>, 957 F.2d 499, 504-05.  However, courts have left "open the possibility that one spouse may maintain exclusive control over certain portions of the family homestead."  <u>Id</u>; <u>see</u> <u>United States v. Rith</u>, 342 F.3d 1323, 1330-31 (10th Cir. 1999) ("[W]hile husband-wife or parent-child relationships give rise to a presumption of control for most purposes over the property, that presumption may be rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room."); <u>Dell</u>, 2004 WL 1783629, at *3 ("In general, a husband or wife can consent to a police search of their shared premised, but they cannot consent to a search of a room or an area devoted to the other spouse's exclusive use."); <u>see</u> <u>also</u> Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> (4th ed. 2006), § 8.4(a).[2]  Evidence of a lock on a door or an agreement, explicit or implicit, that

---

[2] The Court is troubled by the notion that, absent consent, one spouse would have the authority to tell the other spouse that he or she was prohibited from entering certain portions of the marital residence.  <u>See</u> Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> (4th ed. 2006), § 8.4(a) ("The most troublesome issue in the area of spouse consent is not whether, as a general matter, the spouse can give effective consent to a search of jointly occupied premises, but rather whether there may sometimes be certain particular areas within those premises as to which such consent will not be effective.").  This concern is at its greatest when the parties are married and co-owners of a home.  The Court's concern is lessened, however, where, as here, the residence is entirely owned by one of the parties and

(continued...)

the third party never entered a particular area supports a finding that one party maintains exclusive control over certain portions of the residence.  Rith, 342 F.3d at 1331.  Indeed, several cases note that there may be instances where a resident of a home maintains certain areas within the home that are not subject to consent to entry by a co-resident.  See United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992) (locked closet); State v. Kieffer, 577 N.W.2d 352 (Wis. 1998); United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978) (holding that while a mother could consent to a search of her son's room, she did not have authority to consent to a search of a locked footlocker within the room); United States ex rel. Cabey v. Mazurkiewicz, 431 F.2d 839 (3d Cir. 1970) (garage rented solely by husband and for which only husband had key).

     In this case, the facts known to Andreno and Palmer were that Plaintiff was the owner of the home, Sines had previously been instructed by Plaintiff not to go into the study unless he was present, Plaintiff kept the study locked, Sines did not have a key to the study, Sines cut the locks on the study to gain entrance, Sines believed she would be in trouble for cutting the locks, and Sines was extremely upset and scared over having cut the locks.[3] Upon approaching the study, the Deputies observed the cut locks in the bathroom.  When specifically told by Sines that she was not allowed in the room, the Deputies responded that Plaintiff had no right to lock her out of any room in the house.  Sines Dep. at 34.  There is no evidence in the record that Sines had any access into, or ability to enter, the study without

---

[2](...continued)
that party seeks to exclude the co-resident paramour from certain portions of the premises.

     [3] Sines testified at deposition that "I was scared to death that . . . he would have killed me if I went in that room."  Sines Dep. at 30.  Sines further testified that she was "fixated on how much trouble I was in for cutting the locks."  Id. at 33.

Plaintiff's presence or that she regularly entered the room at will.  See, e.g., United States v. Block, 590 F.2d 535, 539-40 (4th Cir. 1978) (a mother has authority to consent to the search of her son's bedroom where the son was a guest occupant of the mother's home and, although the bedroom "was considered exclusively [that of the son] in the familial arrangement, his mother had and exercised unquestioned rights of access to it for cleaning and other household purposes.").  There is no evidence that Sines had a key to the lock on the door.  To the contrary, the evidence is that Sines cut the lock off the door.  Looking at the evidence in the light most favorable to Plaintiff, this is likely because she did not have a key.  Based on these facts, a fair-minded trier of fact could reasonably conclude that Plaintiff maintained exclusive control over the study and that Sines did not have actual, apparent, or implied authority to consent to entry into that room by Andreno and/or Palmer.  Similarly, the trier of fact could reasonably find that the Deputies did not reasonably conclude that Sines had authority (either actual or apparent) to consent to entry into the study.  Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment (4th ed. 2006), § 8.4(a) ("[I]n the absence of some information in the hands of the police which indicates exclusive use, such as that the wife does not have a key to the particular area to be searched, under the apparent authority rule it may be said that if the property is of the kind over which the wife normally exercises as much control as the husband the police may quite properly assume that the wife has authority to consent to a search of that property.") (internal quotations and citations omitted).  Accordingly, Plaintiff has established a colorable claim of a constitutional violation.[4]

---

[4] The Court is not making a finding of a constitutional violation.  Plaintiff has not moved for summary judgment.  There may be facts that Sines did have sufficient access or control over the room

(continued...)

A constitutional violation notwithstanding, official reliance on Sines's consent may validate the search if it was reasonable for the officers to believe she had the requisite relationship. Elliott, 50 F.3d at 186; see Illinois v. Rodriguez, 497 U.S. 177, 179 (1990) (holding that a warrantless search based upon the consent of a third party is valid if the police, at the time of entry, reasonably believe the third party to possess common authority over the premises, even if the third party does not in fact have such authority); O'Rourke v. Huff, 43 Fed. Appx. 436, 438, 2002 WL 1900417 (2d Cir. 2002)(Valid consent for a search may be established "where the police reasonably believed that a party had the authority to consent, even if that belief is erroneous."). The "standard to be applied to the officer's conduct is one of reasonableness, and not clairvoyance." Rodriguez, 497 U.S. at 185-86. Rodriguez validates only searches that are based on a reasonable mistake as to the facts, not those based on an erroneous legal conclusion drawn from the known facts. Elliott, 50 F.3d at 186 (citing United States v. Brown, 961 F.2d 1039, 1041 (2d Cir. 1992)).

Here, there was no mistake of fact. The relevant facts were known to Andreno and Moore at the time they entered the study. They knew that the door was locked, that Sines was not permitted in the room without Plaintiff's presence, and that Sines did not have a key to the door. The only mistake here is an erroneous legal conclusion (that Sines had the authority to consent to entry into the room) drawn from the known facts.

The Court similarly finds that qualified immunity is not warranted under the facts and circumstances presented in this case. It was clearly established at all times relevant

---

[4](...continued)
such that she had actual or apparent authority to consent to entry into the room. The Court is merely finding that, based on the facts in the current record, a jury could reasonably find that Sines did not have actual or apparent authority to consent to entry to the study and that it was not reasonable for the Deputies to conclude otherwise.

hereto that third-party consent is valid only where: (1) the third-party had access to the area

searched; and (2) the third-party had either (a) common authority over the area; (b) a

substantial interest in the area; or (c) permission to gain access.  United States v. Davis, 967

F.2d 84, 87 (2d Cir. 1992); Buettner-Janusch, 646 F.2d at 765.  As the Second Circuit has

stated, "no case in this circuit has delimited the requisite 'access' necessary to satisfy the first

prong of the . . . test."  Ehrlich v. Town of Glastonbury, 348 F.3d 48, 53 (2d Cir. 2003).  While

this uncertainty would tend to weigh in favor of Defendants' claim of qualified immunity, the

word "access" does have a usual and ordinary meaning - "ability or permission to approach",

Random House at 8 - and there has been some elucidation of this term in Supreme Court

and Second Circuit cases.

        In United States v. Matlock, 94 S. Ct. 988 (1974), there was evidence that a woman

living with the defendant consented "to the search of the house, including the east bedroom

on the second floor which she said was jointly occupied by [the defendant] and herself."  Id.

at 991.  The issue before the Court was whether the woman's "relationship to the east

bedroom was sufficient to make her consent to the search valid against [the defendant]."  Id.

Although the Supreme Court concluded that it was likely that the woman's consent was

sufficient, it, nonetheless, remanded the case to the district court the reconsider the

sufficiency of the evidence.  Id. at 996.  The logical inference from this case is that the mere

fact that unmarried persons mutually use a room does not necessarily validate the woman's

consent to search the room.  See U.S. v. Gonzalez Athehorta, 729 F. Supp. 248, 256

(E.D.N.Y. 1990).  Indeed, it was in light of Matlock that the Second Circuit announced that

"[c]onsent to a search by one with access to the area searched, and either common authority

over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." U.S. v. Gradowski, 502 F.2d 563, 564 (2d Cir. 1974).

In U.S. v. Isom, 588 F.2d 858 (2d Cir. 1978), the defendant was a guest at Ames's home. After finding a bullet hole in her refrigerator and engaging in a violent argument with the defendant, Ames called the police and reported that she had a fight with the defendant and that he had guns. Ames allowed the police into the home, wherein they found "one sawed-off shotgun in a pillow and another, along with four other guns, in a metal strongbox under a bed." Id. at 860. Upon reviewing the defendant's motion to suppress the evidence, the Second Circuit had little problem concluding that Ames had authority to consent to a search of the home. With respect to the guns found in the strongbox, however, the Second Circuit stated as follows:

> A troublesome issue . . . remains. Although it is sufficiently clear that Ames consented to the search of the premises with authority to do so, it is less clear that she had authority to consent to the forcible opening of the locked metal box, found under the bed, which contained several weapons. If that box belonged to appellant, then he had a colorable Fourth Amendment interest in keeping its contents private, even though he was only a guest in her apartment. Cf. United States v. Chadwick, 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed.2d 538 (1977) (warrantless search of footlocker forbidden absent exigent circumstances, even though police seized locker and arrested defendants in public place); United States v. Pravato, 505 F.2d 703 (2d Cir. 1974) (leaving open question whether third party's consent to search of room carries with it consent to search defendant's suitcase). Guests have a justifiable expectation under Katz v. United States, 389 U.S. 347, 83 S. Ct. 507, 19 L. Ed.2d 576 (1967), that the contents of locked articles that they bring to the host's premises will remain private. This justifiable expectation should not be vitiated by a strained application of the third-party consent doctrine; the consent of the host should ordinarily be insufficient to justify a warrantless search when it is obvious that the searched item is the exclusive property of the guest. If the police wish to search such an article, then under Chadwick, supra, they may seize it upon probable cause, which they surely had here once the sawed-off shotgun was discovered in the pillow; they may then search the box after they have obtained a warrant.

Isom, 588 F.2d at 861.

In Buettner-Janusch, 646 F.2d 759, the issue presented was whether two individuals had authority to consent to government entry into the defendant's laboratory. Applying the above test, the Second Circuit stated that:

> [B]oth Macris and Jolly had keys to the defendant's laboratory, thus satisfying the access requirement. . . Furthermore, to perform his laboratory duties, Macris was authorized to enter any part of the laboratory and to open any jars of chemicals found there. These facts clearly establish both "common authority" and "permission to exercise access." Jolly also satisfied the second branch of the . . . test because he had standing permission to use the equipment in [the defendant's] laboratory, and was required to pass through it to reach his own facility.

Id.

In this case, the lock on the study door is akin to the lock on the strongbox in Isom. See Isom, 588 F.2d at 861; Chadwick, 433 U.S. 1. Accordingly, Plaintiff had a Fourth Amendment interest in keeping the contents the room private. Id. By locking the door and apprising Sines that she did not have permission to enter, it cannot be said that defendant assumed the risk that someone having authority over the area to be searched would permit the governmental intrusion in his own right. Buettner-Janusch, 646 F.2d at 764. There is no evidence that Sines had a key to the study or was otherwise permitted to enter it. It should have been clear to the Deputies that, because Sines did not have a key or permission to enter the study, she did not have "access." Even assuming that the term "access" is broader and encompasses one's ability to approach (as opposed to one's ability to enter) an area (a doubtful proposition), the remaining elements of the test are not satisfied on the current record. Sines did not have common authority over the area. It was known to the Deputies that Plaintiff owned the residence, that Sines was prohibited from entering the study without

Plaintiff's presence, and that she cut the lock to gain entry (probably because she did not have a key).  The Deputies, therefore, could not reasonably conclude that Plaintiff had common authority over, or control, of the study for must purposes.  Sines similarly did not have a substantial interest in the area.  Although Sines surmised that Plaintiff secreted some of her personal items in the study, that did not create a substantial interest in the area.  Finally, it should have been obvious to the Deputies based on Sines's own statements that she did not have permission to gain access to the room.  Because there were no facts indicating that Sines could enter the room at will or without the consent of Plaintiff, she cannot be said to have had mutual use of the property by virtue of joint access.  See U.S. v. Orejuela-Guevara, 659 F.Supp. 882 (E.D.N.Y. 1987); U.S. v. Gonzalez Athehorta, 729 F.Supp. 248, 256 (E.D.N.Y. Feb 01, 1990).  In Isom, the Second Circuit stated that "the consent of the host should ordinarily be insufficient to justify a warrantless search when it is obvious that the searched item is the exclusive property of the guest."  588 F.2d at 861.  Here, the lack of consent is even more compelling where the consent is purported to have been obtained from a known guest who was not permitted to enter, and did not have a key to, the room.  Accordingly, based on the evidence before the Court, it cannot be said that the Deputies acted reasonably under the circumstances and Defendant's motion for summary judgment on the ground of qualified immunity must be denied.

### 2.   Exigent Circumstances

Defendants next contend that they were permitted to enter the residence and study without a warrant under the exigent circumstances exception.  Defendants state that exigent circumstances were present because: (1) they responded to a domestic violence call; (2)

upon arrival Sines was "hysterical"; and (3) Sines informed Defendants that, days before, she

got into a violent altercation with Plaintiff wherein he choked her and threatened to kill her.

As the Second Circuit has explained:

> the test for determining whether a warrantless entry is justified by exigent
> circumstances is an objective one that turns on the district court's
> examination of the totality of circumstances confronting law enforcement
> agents in the particular case. . . . The essential question in determining
> whether exigent circumstances justified a warrantless entry is whether law
> enforcement agents were confronted by an "urgent need" to render aid or
> take action.

United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990). Relevant factors to consider

in determining whether exigent circumstances are present include: "(1) the gravity or violent

nature of the offense with which the suspect is to be charged; (2) whether the suspect is

reasonably believed to be armed; (3) a clear showing of probable cause to believe that the

suspect committed the crime; (4) strong reason to believe that the suspect is in the premises

being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6)

the peaceful circumstances of the entry." Id. at 769-770.

Upon review of these factors, it is clear that no exigent circumstances existed and

reasonable officers could only conclude that there were no exigent circumstances. Looking

at the first factor, Sines's allegations were serious, but they pertained to conduct that

occurred several days earlier. Moreover, Sines had not summoned the police because of

Plaintiff's earlier conduct, but because she believed Plaintiff might return home and become

violent. There was nothing urgent or imminent. The Court finds that this factor is either

neutral or weighs in favor of Plaintiff.

The second factor clearly weighs in favor of Plaintiff. The police were not looking

for Plaintiff for having committed a violent crime. Plaintiff was not alleged to have been

armed and dangerous.  Once the officers arrived on the scene (and before entering the home), it should have been obvious that Plaintiff was not home.  At most, there was a possibility of violence *if* Plaintiff returned home and found Sines moving out.

The third factor also weighs heavily in favor of Plaintiff.  Again, the police were not on the scene looking to arrest Plaintiff.  At the time the police entered the residence, there was little reason to believe that Plaintiff had done anything.  Even with the information that Plaintiff had choked and threatened Sines, the police were not there to investigate or apprehend Plaintiff in connection with any crime.[5]

The fourth factor strongly weighs against a finding of exigent circumstances.  There was no reason to believe that Plaintiff was in the residence.  To the contrary, the police should have known that they were on the scene to protect Sines in the event Plaintiff showed up.  As previously noted, once the police arrived at the house, they should have readily discerned that Plaintiff was not present.

The fifth factor also weighs against a finding of exigent circumstances.  There being no crime and no suspect, there was little reason to fear an escape.

Considering the totality of the circumstances, the Court finds that no exigent circumstances existed and that reasonable officers could only conclude that exigent circumstances were not present.  Although Sines may have been in fear for her safety, there were no threats directed at her on that date and Plaintiff was not in the home.  While Plaintiff understandably wanted to get her belongings out of the house, there was nothing indicating a sense of urgency that required the Deputies to enter the home or the study.  Inasmuch as the

---

[5] On the record before the Court, it is unclear whether the alleged choking incident or threats even occurred in the State of New York.

only concern was if Plaintiff returned home, the Deputies could have waited outside the home or study to see if Plaintiff returned and, if so, they could have acted accordingly.

Based on the foregoing, the Court concludes that a jury could reasonably conclude that Andreno and Palmer entered Plaintiff's study without a warrant, without proper consent, and under circumstances that presented no exigencies. The Court further concludes that, based on the record evidence, Andreno and Palmer are not entitled to qualified immunity.

### c. __Municipal Liability__

Defendants next move to dismiss the claims for municipal liability. Plaintiff asserts claims for failure to supervise and failure to train. "In Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978), the Supreme Court established that '[l]ocal governing bodies · · · can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" Amnesty America v. Town of West Hartford, 361 F.3d 113, 124 (2d Cir. 2004).

In this case, there is no evidence that Andreno or Palmer were final decision-markers or final policy-makers. There similarly is no evidence that Andreno or Palmer were acting pursuant to an official policy, that any policy-makers or decision-makers were aware of any constitutional violations, that there was an obvious need for corrective action concerning a serious problem of unconstitutional conduct, or that policy or decision-makers were deliberately indifferent to any constitutional violations upon which it could reasonably be concluded that there has been a failure to train or failure to supervise. Amnesty Am., 361 F.3d at 128. Plaintiff similarly has failed to present any evidence of the County's training

program or how any such training program may have contributed to the constitutional

violations asserted in this case.  See Amnesty Am., 361 F.3d at 127 n.8.  Accordingly, the

claims against the County of Delaware and any official capacity claims must be dismissed.

### d.        Claims Against Sheriff Mills

Defendant Mills move to dismiss the claims against him on the ground that there is

no evidence that he was personally involved in any constitutional deprivations or other acts

about which Plaintiff complains.  Because Plaintiff has failed to point to any evidence of

personal involvement by Sheriff Mills, the claims against him are dismissed.  Farrell v. Burke,

449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages

under § 1983.") (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

### e.        Malicious Prosecution

Defendants next move to dismiss Plaintiff's claim for malicious prosecution on the

ground that they acted with probable cause.  To succeed on a claim for malicious

prosecution, Plaintiff must demonstrate that "(1) that the defendant initiated a prosecution

against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding

could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was

terminated in the plaintiff's favor."  Posr v. Court Officer Shield # 207, 180 F.3d 409, 417 (2d

Cir. 1999).

Here, it is undisputed that elements one and four are satisfied.  Plaintiff

unquestionably was prosecuted and the charges were dismissed by the County Court.  The

Court will, thus, address the issue of probable cause.  As the Second Circuit has recently

stated, "[t]he absence of probable cause is an essential element of a claim for malicious

prosecution." <u>McClellan v. Smith</u>, 439 F.3d 137, 145 (2d Cir. 2006).  A grand jury indictment creates a rebuttable presumption of probable cause.  <u>Id</u>.  This presumption may be rebutted with evidence of police misconduct, such as presenting evidence that the indictment was produced by fraud, the suppression of evidence, misrepresentation of facts, perjury, or other police misconduct taken in bad faith.  <u>Id</u>.

In this case, Plaintiff was indicted by a grand jury, thereby raising the presumption of probable cause.  Plaintiff has failed to point to any evidence tending to rebut this presumption.  There is no evidence in the record that the indictment was procured through fraud, the suppression of evidence, or other police misconduct.[6]

Accordingly, the malicious prosecution claim must be dismissed.

### f.        Intentional Infliction of Emotional Distress

Defendant next moves to dismiss Plaintiff's claim of the intentional infliction of emotional distress.  Defendants' conduct in entering the home, entering the study, seizing the drugs, and charging Plaintiff is not sufficiently extreme or outrageous to support a claim for the intentional infliction of emotional distress.  <u>Murphy v. American Home Products Corp.</u>, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 90 (1983).  This claim must be dismissed.

### g.        Defendant Sines's Motion for Summary Judgment

Defendant Sines moves to the dismiss the constitutional claims against her on the ground that she was not acting under color of state law.  "In order to state a claim under § 1983, a plaintiff must allege that he was injured by either a state actor or a private party

---

[6] Indeed, the County Court concluded that there was sufficient competent evidence before the grand jury to support the indictment.  To the extent Plaintiff claims that there was conflicting testimony whether the Deputies or Sines cut the locks off the study door, the only competent evidence before the Court is that Sines cut the lock.

acting under color of state law." Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002). "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. Put differently, a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." Id. (internal quotations and citations omitted). "A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." Id.

In this case, Sines is a private individual. There is no evidence that she was acting under color of state law. There similarly is insufficient evidence that Sines was acting as an agent of, or in concert with, the police. The competent record evidence before the Court demonstrates that Sines summoned the police to protect her in the event that Plaintiff returned home while she searched the home for, and packed, her belongings. As a general rule, a person seeking police assistance does not thereby become an accomplice to the police. There is no evidence that Defendants searched Plaintiff's home or encouraged Sines to search the home on their behalf or that Sines otherwise was a willful participant in joint activity with the police. See Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 271-72 (2d Cir. 1999) (and cases cited therein); see also Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002). Any conclusion that Sines and the Deputies acted in concert would be based upon sheer surmise and conjecture. Accordingly, any constitutional claims against Sines are dismissed.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment are

GRANTED IN PART and DENIED IN PART.  Plaintiffs' claims against the County of

Delaware, Thomas Mills, and Ruth Sines are DISMISSED IN THEIR ENTIRETY.  Plaintiffs'

claims of malicious prosecution and the intentional infliction of emotional distress are

DISMISSED.  In all other respects, Defendants' motion for summary judgment is DENIED.


IT IS SO ORDERED.

Dated:   July 17, 2006

Thomas J. McAvoy
Senior, U.S. District Judge

- 24 -